**Ann BRANDAU, Plaintiff,**

v.

**STATE OF KANSAS, Defendant.**

**Civil Action No. 96–2414–KHV.**

United States District Court,
D. Kansas.

June 11, 1997.

Jeffrey A. Dehon, Kansas City, KS, Martin M. Meyers, Stephen C. Thornberry, The Meyers Law Firm, Kansas City, MO, for Ann Brandau.

John R. Dowell, Eliehue Brunson, Kevin D. Case, Office of the Attorney General, Topeka, KS, for State of Kansas.

Kevin D. Case, Office of the Attorney General, Topeka, KS, for Kansas Judicial Center, Twenty–Ninth Judicial District.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on the *State of Kansas' Motion For Summary Judgment* (Doc. # 45) filed May 1, 1994. Plaintiff brings claims for hostile work environment sexual harassment, *quid pro quo* sexual harassment, retaliation and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended. Although defendant denies

that inappropriate activity occurred, it admits nearly all of plaintiff's material facts, as set forth in her interrogatory answers, for purposes of this motion. Defendant argues that despite numerous factual allegations, plaintiff fails to create a genuine issue of material fact for trial. The Court, however, disagrees. Viewing the evidence in the light most favorable to her, plaintiff raises genuine issues of material fact not suitable for summary judgment. Accordingly, the State's motion is overruled.

### Summary Judgment Standards

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who fails to make a showing to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 893 (10th Cir.1994). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party properly supports its motion, the nonmoving party may not rest upon mere allegation or denials of his or her pleadings, "but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Thrasher v. B & B Chem. Co., Inc.,* 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

### Factual Background

The Court finds the following facts are material to its inquiry. As noted, defendant accepts these facts as true for purposes of its motion.

Plaintiff worked for the State of Kansas from August 1993 through September 29, 1995, as a Court Security Officer ("CSO") in the Adult Probation Division for the 29th Judicial District in Wyandotte County, Kansas. At all times relevant to this action Therese Gardner supervised plaintiff; Jim Draves supervised Gardner; Bill Burns supervised both Gardner and Draves, as well as John Duma (the Court Services Administrative Officer); and Administrative Judge Phillip Sieve supervised Burns.

Beginning in approximately December 1994, and continuing until April 1995, Duma made gestures and looked at plaintiff in a way which made her feel uncomfortable. In May, 1995, in response to a conflict between plaintiff and another CSO (Karen Gardner) Duma suggested that plaintiff move her things into his office. Plaintiff did move into Duma's office for approximately two weeks during that month. At about this time, (on multiple occasions) in the spring of 1995, Duma told plaintiff that he loved her. Duma qualified these statements by saying "of course, in a fatherly sort of way." Duma also gave plaintiff gifts such as a small

stuffed animal, candy and a medallion. Sometime between April and July, 1995, Duma commented to plaintiff that he liked the way her red and white dress laid against her body. On one occasion in March or April of 1995, Duma asked plaintiff to hold his hand because his back hurt.[1]

Duma kissed plaintiff on two occasions. On another occasion, he entered plaintiff's office and asked plaintiff and her co-worker Pam Kendall if they wanted to see a bruise on his "behind." Both said no, but Duma pulled down his pants and showed them the bruise. On a separate occasion, Duma told plaintiff that the best thing in his life would be to make love to her. On several occasions in May and June, 1995, he also told plaintiff that she looked just like his wife when she was younger.

Duma called plaintiff at home on several occasions. Once he called plaintiff, said "hello darling," and invited plaintiff and her niece to go to Hooters to eat with him and his grandson. On Friday, May 26, 1995, Duma asked plaintiff if he could call her over the weekend. Plaintiff told him that it would not be a good idea but Duma called her anyway on May 28. Duma also called plaintiff at her parents' home in Iowa in early May 1995. At work, Duma sometimes referred to plaintiff as "my little angel." Some time prior to June 1, 1995, Duma called plaintiff's home and recited the poem/song "my little angel" on her answering machine.

On June 2, 1995, Duma called plaintiff into his office, held plaintiff's hands, and told her "I love you and I will never let anyone hurt you." On another occasion he told plaintiff, "I love you kiddo, no, no, I really do." Duma made this comment to plaintiff in her office. Duma told plaintiff "he hadn't felt this way in 30 years."

On June 5, 1995, Duma discussed with plaintiff the possibility that Kristin Gardner was tape recording plaintiff's personal conversations. Duma asked plaintiff if she was wired. When plaintiff told Duma that she was not, he asked if he could search her.

Supervisors Draves and Garner noticed that Duma spent substantially more time talking with plaintiff at work than he did with other employees. At the end of May or beginning of June, 1995, plaintiff complained to Draves and Gardner about Duma's conduct. On May 24, 1995, plaintiff complained to Duma directly. The next day, Duma walked by plaintiff and stated that he was not allowed to speak with her anymore. Later that same day, Duma told plaintiff he was devastated that he could not talk to or hold her anymore. He also said that he did not like her attorney, Jeff Dehon. Duma told plaintiff to get another attorney. On May 26, 1995, he told plaintiff that if she ever discussed their personal conversations with anyone or "let Mr. Dehon [plaintiff's attorney] mess with his family," plaintiff would be fired. Duma asked plaintiff on more than one occasion whether she planned to file a sexual harassment suit against him.

On June 7, 1995, plaintiff complained to Administrative Judge Sieve about Duma's behavior. On June 9, 1995, Duma told plaintiff that he would be monitoring the sign-in sheet very closely. He followed up by having Debbie Massey monitor plaintiff's performance more closely than she monitored other employees. Duma also told plaintiff that he was instructed to watch her very carefully for the duration of a work release project she was working on.

In the summer of 1995, John Duma ordered Therese Gardner to perform a case audit of plaintiff's files. To plaintiff's knowledge, Duma ordered no other audits. Also in the summer of 1995, Duma requested that plaintiff carbon-copy him on all departmental correspondence. To plaintiff's knowledge, Duma did not ask other employees to do so.

### *Analysis*

### A. SEXUAL HARASSMENT CLAIMS

Two theories of sexual harassment may be shown under Title VII: hostile work environment and *quid pro quo* discrimination. *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Plaintiff sues under both theories.

---

**1.** This incident occurred in Therese Gardner's office, while she was present.

■ To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that: (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *See Bailey v. West,* 941 F.Supp. 1023, 1026 (D.Kan.1996); *Eichenwald v. Krigel's Inc.,* 908 F.Supp. 1531, 1539 (D.Kan. 1995).

To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile, or offensive working environment. *Martin,* 3 F.3d at 1418. The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). These factors are evaluated from both a subjective and an objective viewpoint. The Court must consider not only the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position.[2]

■ Episodic and isolated incidents or verbal comments which are severe neither in duration nor content will not form the basis for a claim of hostile working environment. *See, e.g., Bolden v. PRC, Inc.,* 43 F.3d 545, 550 (10th Cir.1994) *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). On the other hand, misconduct that is relatively less severe may become actionable, especially when the alleged misconduct is that of a supervisor, when it is so frequent and pervasive that it affects an employee's work environment. *See Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1193 (D.Kan.1995).

■ Defendant argues that it is entitled to summary judgment on plaintiff's hostile environment claim because many of plaintiff's claims were not sexual in nature or were not sufficiently pervasive to change the nature of her employment. Additionally, defendant argues that many of plaintiff's allegations did not occur at work or were not factually related to the workplace. The Court is unpersuaded by these objections.

■ Plaintiff is a member of the protected class and the uncontroverted facts— including but not limited to, Duma telling plaintiff he loved her on multiple occasions, kissing her, and telling her the best thing in his life would be to make love to her—raise genuine issues of fact on the remaining elements of her claim.[3] A reasonable person could find, based on the totality of the circumstances, that Duma's conduct was unwelcome sexual harassment that affected the terms and conditions of plaintiff's employment.[4] Accordingly, defendant's motion for

---

2. Although the conduct must be sufficiently severe or pervasive, the plaintiff need not prove that she was psychologically injured. "Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of work-

place equality." *Harris,* 510 U.S. at 22, 114 S.Ct. at 370–71.

3. Defendant does not dispute the fifth element, that some basis exists for imputing liability.

4. Contrary to defendant's argument the conduct complained of need not be overtly sexual in nature. It is enough that the plaintiff was subjected to different terms and conditions of employment due to her sex. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987). Moreover, the Court should consider plaintiff's evidence of acts occurring outside the workplace. *See Huitt v. Market Street Hotel Corp.,* 1993 WL 245744 at *5 (D.Kan.1993); *accord Haehn v. City of Hoisington,* 702 F.Supp. 1526, 1529 (D.Kan. 1988).

summary judgment on plaintiff's hostile work environment claim is overruled.

■ Plaintiff also claims that the State of Kansas is liable under a theory of *quid pro quo* harassment. The gravamen of this claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature, and that adverse job consequences result from the employee's refusal to submit to the conduct. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987).

Plaintiff claims that after she rejected Duma's advances he used her rejections as a basis for adverse employment decisions— closely monitoring her job performance, attendance and correspondence. Defendant argues that plaintiff's claim fails because Duma never expressly required plaintiff to submit to sexual conduct or made acceptance of such conduct a condition of any employment benefit. In support of this argument defendant offers plaintiff's deposition testimony that Duma never told her "if you don't sleep with me, I'll fire you." Defendant concedes, however, that "at worst" plaintiff has shown that Duma told her that if she discussed their personal conversations with anyone or let her lawyer "mess with his family," she would be fired.

■■ "[T]here is no requirement of an express statement from the harasser linking job benefits to plaintiff's submission to sexual advances." *See Huitt*, 1993 WL 245744 at *3. Moreover, we reject any implication "that the harasser and harassed must reach some type of agreement as to the consequences of an employee's refusal to submit to sexual advances" in order to state a claim for *quid pro quo* harassment. *See id.* Indeed, the Equal Employment Opportunity Commission ("EEOC") guideline defining sexual harassment states that:

> [u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's

employment, or (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual....

29 C.F.R. § 1604.11(a).

The record contains evidence that Duma subjected plaintiff to unwelcome sexual conduct and, when rejected, used this as the basis for adverse decisions affecting the terms, conditions or privileges of her employment. *See Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir.1994) *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Huitt*, 1993 WL 245744 at *3.[5] Defendant's motion for summary judgment on this claim is therefore overruled.

## B. RETALIATION

■ Plaintiff's third claim is that defendant illegally retaliated against her, in violation of Title VII, after she complained about a hostile work environment. Title VII makes it illegal for an employer to take adverse employment actions against an employee for engaging in activity protected by the statute. *See* 42 U.S.C. § 2000e–3. To establish a prima facie case of retaliation under this section, plaintiff must demonstrate sufficient evidence from which a jury could decide (1) that she engaged in protected opposition to Title VII discrimination; (2) that her employer took adverse action subsequent to or contemporaneously with her protected activity; and (3) that a causal connection exists between the two. *See Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993). The casual connection may be proven with circumstantial evidence that justifies an inference of retaliatory motive, such as protected conduct closely followed in time by adverse action. *Burrus v. United Tel. Co.*, 683 F.2d 339, 343 (10th Cir.1982) *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

Again, defendant has not met its burden of demonstrating that no reasonable juror could find for plaintiff on this claim. It is undisputed that plaintiff engaged in protected op-

---

**5.** There is nothing in the language of Title VII or the EEOC regulations which requires proof of actual economic loss in order to state a claim of *quid pro quo* sexual harassment. *See Karibian,* 14 F.3d at 778.

position to discrimination: she spoke directly with Duma, reported Duma's conduct to her supervisors Therese Gardner and Jim Draves, and also met with Judge Sieve, the chief administrative authority.

Shortly after she made these complaints, Duma began treating plaintiff differently than other employees. Defendant contends, without supporting authority, that having plaintiff's attendance monitored, having her case files audited and overseeing all of plaintiff's correspondence is not enough to constitute adverse employment action. The Court disagrees and finds that this alleged conduct fulfills the second prong of plaintiff's prima facie case. Moreover, defendant's argument excludes an important fact supporting plaintiff's retaliation claim: Duma told plaintiff if she discussed their personal conversations with anyone, or let her attorney "mess with his family," she would be fired. This comment, and the close temporal connection between plaintiff's complaints and Duma's adverse actions, raise a triable issue of fact on the final element—causal connection. Because the record contains evidence from which a reasonable jury could find that Duma took adverse job action against plaintiff as a result of her sexual harassment complaints, summary judgment on this claim must be denied.

## C. CONSTRUCTIVE DISCHARGE

Plaintiff contends that defendant's illegal acts forced her to resign. An employee who is not formally discharged from employment may still be constructively discharged if the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986); *Ulrich v. K–Mart Corp.*, 858 F.Supp. 1087, 1093 (D.Kan.1994) *aff'd,* 70 F.3d 1282 (10th Cir.1995) (Table). Plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich,* 858 F.Supp. at 1093.

The Court cannot conclude, as a matter of law that no reasonable person in plaintiff's position would consider the working conditions so intolerable as to quit. Moreover, defendant admits as uncontroverted for purposes of this motion that "plaintiff was forced to resign on September 28, 1995." This admission is a sufficient basis on which to deny summary judgment on this claim.

**IT IS THEREFORE ORDERED** that the *State Of Kansas' Motion For Summary Judgment* (Doc. # 45) filed May 1, 1997, be and hereby is overruled.