Elizabeth MORTON, Plaintiff,

v.

STEVEN FORD–MERCURY OF AUGUSTA, INC., Defendant.

No. 00–1272–JTM.

United States District Court,
D. Kansas.

Sept. 26, 2001.

James P. Johnston, The Johnston Law
Offices P.A., Wichita, KS, for plaintiff.

Terry L. Mann, Wallace & Swartz, L.L.P., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on defendant's motion for summary judgment in this Title VII sexual harassment case. Defendant filed its motion on May 21, 2001 and plaintiff responded on July 3, 2001 after receiving the appropriate extensions. Defendant replied on August 17, 2001 with an appropriate extension of the reply period. As such, the matter is fully briefed and ripe for determination. For the reasons set forth below, the court denies defendant's motion.

### I. Factual Background

Defendant is an automobile dealership located on Highway 54 between Augusta and Andover, Kansas. It is a member of the Steven Motor Group, of which Mike Steven is the principal owner. The corporate headquarters of the Motor Group is located in Wichita, Kansas. Defendant hired plaintiff as a commissioned automobile salesperson on November 20, 1997. Lawrence ("Larry") Sewell was, at all times pertinent to this action, the general manager of defendant, with direct supervisory authority over plaintiff. During the relevant period, Jason Wolff was defendant's sales manager, with authority to make certain decisions regarding automobile deals. Defendant contends that Wolff could not hire, fire, promote, demote, or give or withhold compensation from any of defendant's employees. Plaintiff, on the other hand, asserts a number of facts suggesting that Wolff was in a supervisory position over defendant's sales personnel. First, plaintiff testifies that defendant required its sales personnel to obtain Wolff's approval before entering an agreement for the sale of an automobile. Since defendant paid plaintiff on a sales commission basis, Wolff's disapproval of a sale would impact plaintiff's ability to obtain a commission. However, defendant's sales personnel could obtain sales authority from Sewell as well as Wolff. Similarly, Wolff was responsible for distributing "house deals" among defendant's sales personnel. A "house deal" is a prospective purchaser who comes to the dealership through some friendship or family connection with a person in management in the auto group. Even though the salesperson selected by Wolff would exert little effort in making the sale, he or she would get the full commission. Plaintiff thus alleges that the authority to distribute "house deals" would impact her compensation. Second, plaintiff asserts that Wolff interviewed her for the position with defendant and, after she accepted the position, told her to report to him on her first day of work. Plaintiff Deposition, at 43. Third, plaintiff notes that other employees believed that Wolff had the authority to hire, fire, promote, and affect the compensation of the sales staff. *See* Horn Deposition, at 44. According to a former employee, Brent Sawdy, Wolff actually terminated him since he and Wolff were not getting along. Sawdy Deposition, at 7. Plaintiff testified that she believed Wolff had terminated Sawdy, but had no first hand knowledge of that fact. Plaintiff Deposition, at 263–65. Yet another employee, Bill Martin, testified that, in situations where Sewell was unavailable, Wolff would make all of defendant's managerial decisions. Martin Deposition, at 44. Plaintiff asserts that these facts raise a triable issue as to whether Wolff was, in fact, in a supervisory position over plaintiff.

On November 25, 1997, plaintiff participated in defendant's new employee orientation. During the orientation, defendant gave plaintiff the Steven Motor Group Employee Handbook. On the same day, plaintiff received a separate acknowledgment form regarding the company's posi-

tion on sexual harassment. Both the handbook and the separate acknowledgment state that defendant forbids sexual harassment. See Def. Ex. 7, at 2–3; Def. Ex. 8. Further, both documents outline a procedure for reporting any sexual harassment which might occur in the workplace. Employees who believe that they have experienced sexual harassment are directed to immediately report the offending conduct to either their supervisor or a corporate office manager. During the orientation, Greg Andersen, defendant's corporate counsel, advised plaintiff that she could raise any such concerns directly with him. Defendant also gave plaintiff an additional training course where she met with Mike Steven, the owner of the auto group. The training took place every morning during an eight-week period. Mike Steven went through the handbook with plaintiff and other participating employees and instructed the employees that, if they had any problem that their supervisors were not addressing at the dealership level, they could come to him with the issue. Plaintiff Deposition, at 53. Plaintiff continued to have monthly sales meetings with Mr. Steven on the first Wednesday of every month. Plaintiff states that Mr. Steven did not ever treat her in an unprofessional or inappropriate manner and that she did not know whether he would tolerate inappropriate behavior from his subordinates. At no time did plaintiff raise the concerns presented in this case to Mike Steven or any other member of the corporate office management, including Greg Andersen.

Plaintiff asserts that she was subjected to sexual harassment throughout her employment with defendant, with the conduct commencing as early as two weeks after her employment began. The first specific incident about which plaintiff complains involved an act allegedly aimed at her then seventeen-year-old daughter, Erica Morton. According to the testimony of Sawdy, when Erica was visiting the dealership, another salesperson, Kyle Owens, audibly stated that he "would do anything to have a piece of that." Sawdy Deposition, at 10. While making this statement, Owens was allegedly grabbing his crotch. *Id.* Plaintiff was not close enough to Owens to directly hear the comment, but claims to have witnessed Owens' gesture. Plaintiff Deposition, at 70. Plaintiff acknowledges that Title VII only applies to harassment against "employees," which Erica was not, but asserts that the incident is relevant for its impact upon her own state of mind. When plaintiff confronted Owens about the comment, she asserts that he offered an insincere apology. Plaintiff Deposition, at 75–76. The court notes that Owens was one of defendant's sales personnel and, at all relevant times, had no supervisory authority over plaintiff. Larry Sewell was not present at the time of the incident and plaintiff did not make any complaint, either to Sewell or other members of management, regarding Owens' comment and gesture toward Erica Morton.

After the incident, Erica Morton apparently entertained the idea of working for defendant. According to Erica's testimony, Sewell initiated the idea by telling her that he was looking for somebody in a reception type position. Erica Morton Deposition, at 29. Erica asserts that the conversation regarding employment was the culmination of some seven other times that Sewell had asked Erica to come into his office and talked with her about her social life and other various topics, such as her similarity in appearance to his first wife. *Id.* at 17–22, 25. Erica testified that plaintiff would allow her to work at the dealership as long as she worked when plaintiff would be available to "watch over [her]." *Id.* at 32. Plaintiff testified that, despite her confrontation with him, Owens continued to make comments about Erica to plaintiff and others. Plaintiff Deposition, at 114. Bill Martin testified that

Owens would talk about taking pictures of Erica from plaintiff's desk because he enjoyed looking at them in the restroom. Martin Deposition, at 16–17. Plaintiff was familiar with these comments and others regarding how Owens would be willing to divorce his wife for a chance with Erica. Plaintiff Deposition, at 114–115.

Plaintiff next describes a number of harassing actions which she personally experienced at the dealership. Plaintiff asserts that she first began to experience verbal harassment primarily from Owens in December of 1997 or January of 1998. Beginning in that period, Owens would, on a daily basis, suggest to plaintiff that they should go to lunch for a "furburger" or a "cherry bendover." Also on a daily basis, Owens would suggest that he and plaintiff should lie down in the back seat of one of the dealership's conversion vans to "see how it works." Plaintiff Deposition, at 83–84. Plaintiff finally complained to Sewell about Owens' behavior in March of 1998 and again during the summer of 1998. *Id.* at 403. In making those complaints, plaintiff specifically mentioned the "furburger" and "cherry bendover" comments. *Id.* at 93. Additionally, plaintiff testified that Sewell had heard the comments firsthand on numerous occasions because he was out on the showroom floor when Owens made the comments. *Id.* Of course, defendant properly notes that Sewell's presence when Owens made such comments is not direct proof of his actual knowledge of the statements. Plaintiff did not complain to Sewell more frequently because he often was present when other employees were making the comments, which led plaintiff to believe that Sewell was not going to take any action on her complaints. *Id.* at 95. In fact, at one point when Owens was verbally accosting plaintiff, Sewell simply stood in the doorway of his office and stated "Kids, what do you do with kids." *Id.* at 106. When plaintiff did complain to Sewell, he stated that he would talk to

Owens. *Id.* at 94. However, the comments did not cease and Sewell took no further curative action. *Id.* at 96. Plaintiff did not complain to anyone besides Sewell such as any management personnel at the corporate offices.

Plaintiff also complains that Owens pointed out and commented on inappropriate pictures from two magazines. The magazines were a Cosmopolitan and a Victoria's Secret catalog which plaintiff and another female employee, Marcena Mitchell, had brought to the dealership. Plaintiff claims that Owens, without her authorization, rifled through the Cosmopolitan which he took from plaintiff's desk and found an advertisement for an item called "Tickling Panties." Owens approached plaintiff with the advertisement and suggested that she should place an order for the item even though "he'd rather do the job himself." *Id.* at 283–84. Plaintiff doesn't believe that Sewell heard this comment but does know that Owens took the magazine and advertisement into Sewell's office and heard Sewell and Owens joke about the ad. *Id.* at 277. Similarly, Owens took the Victoria Secret catalog from plaintiff's desk. He then brought the magazine to plaintiff and opened the catalog to the brassiere section and stated his discontent that his wife was "inadequate in that department." *Id.* at 279. Another male co-worker, Hugh Leshley, who had accompanied Owens, stated that he wished that "he could only get some." *Id.* After that day, plaintiff took both of the magazines home. Owens, on a separate occasion which occurred during the height of the Monica Lewinsky saga, would ask plaintiff if she had "ever used a cigar" and offered to provide her with a cigar if she wanted to try it out. *Id.* at 261. Leshley joined in by telling plaintiff that "you don't know if it's good unless you try it." *Id.* On yet another occasion, Owens told plaintiff, who was standing in front of a picture window,

that he could "see through my dress and told me so. He told me I did not have to move as he was kind of enjoying it." *Id.* at 390.

Plaintiff next asserts that Jason Wolff physically harassed her on a number of occasions. Specifically, plaintiff testified to being pinched on the arms, cheeks, shoulders and under her arms near her breasts. *Id.* at 370–72. The first pinching incidents occurred in February of 1998 and continued into June of 1998. Plaintiff recorded some of the incidents in a log book, but also states that she did not specifically record many such events but began generally stating in her logbook such things as some person's initials and the phrase "nasty" to indicate that the activity had resumed. *Id.* at 212. Wolff denies plaintiff's allegations. However, a number of other employees testified as to Wolff's pinching or grabbing plaintiff's shoulders. See Mitchell Deposition, at 19; Martin Deposition, at 63; Horn Deposition, at 68–69. Wolff suggests that plaintiff may simply be recalling his attempts at soothing her through a friendly massage. It was common for Wolff to touch other members of the sales staff in such a manner, both male and female. Horn Deposition, at 69. Other than plaintiff, there were no other witnesses to Wolff pinching plaintiff's arms, underarms, etc. Erica Morton did testify that she witnessed some bruising consistent with a pinch mark on plaintiff's left arm after plaintiff informed her about one of the pinching incidents. Erica Morton Deposition, at 39–41. Plaintiff also testifies that on a number of occasions, Wolff would come from behind her, place his arm around her and subdue her arms, and then would mess up her hair or pinch her, etc. Plaintiff Deposition, at 203. Frequently, plaintiff would try to get loose, but would rarely succeed. On one occasion, she attempted to twist away from Wolff and ended up unintentionally slapping him across the face. Plaintiff also complains

that on at least three occasions she personally witnessed Wolff defacing plaintiff's office by taking pictures off the walls and putting them in the trash, taking plaintiff's snack-food, and placing books and files on top of her desk in a state of disarray. Additionally, Wolff would continually taunt plaintiff by stating "Let's go get high, Liz" and pretending to smoke a marijuana cigarette. Plaintiff Deposition, at 248. Joshua Horn corroborated plaintiff's testimony in this regard. Horn Deposition, at 22–23.

In April of 1998, plaintiff complained to Sewell about the pinching and grabbing. Plaintiff Deposition, at 208. Plaintiff testified that she was visibly on the verge of crying during her interview with Sewell. Sewell told her that he would talk to Wolff. Additionally, plaintiff informed Sewell that Wolff would not help her with her potential sales anymore. Sewell told plaintiff to come directly to him or to Dan Paolucci if she needed assistance in the future. Plaintiff believes that Sewell did talk to Wolff about the physical contact with plaintiff. She testified that after that time Wolff did stop touching her for awhile, but that the contact resumed in June or July of 1998. Plaintiff also testified that Wolff hated her because she had gotten him into trouble with Sewell. In fact, plaintiff testified as to one instance, occurring shortly after Sewell spoke to Wolff, where Wolff cornered plaintiff in a hallway, pushed her against a wall, and forced plaintiff to retreat in the direction from which she had come. Plaintiff did not believe this action was sexual in nature, but more of an intimidation tactic that stemmed from Wolff's anger at plaintiff. Plaintiff Deposition, at 220. Plaintiff also indicated that on a number of occasions Wolff would orchestrate a situation where plaintiff would be forced to brush past and touch him. *Id.* at 218. Finally, plaintiff asserts, with supporting testimony from other employees, that Wolff referred to her as a "bitch."

Martin Deposition, at 31–32; Sawdy Deposition, at 51; Mitchell Deposition, at 21.

Next, plaintiff complains about Larry Sewell's conduct toward her as well as the conduct he knowingly allowed to occur. Plaintiff asserts that, on one occasion, Sewell approached plaintiff from behind and wrapped his arms around her. Plaintiff Deposition, at 149–50. Plaintiff apparently said nothing but simply pulled away and "got loose." *Id.* Plaintiff believed that other sales personnel were present but could not recall who could specifically corroborate the incident, which Sewell denies. Plaintiff and a number of the other employees testified that use of profane language was rampant at the dealership and that Sewell could not have been unaware of its use. Plaintiff does not contend that the language was directed at her, but argues that the unchecked conversational use of profane language added to the aggregate negative circumstances at the dealership. Defendant points out that plaintiff allegedly cursed at least once while at the dealership, calling Kyle Owens a "little shit." Sawdy Deposition, at 57. Plaintiff did not hear a significant amount of cursing from Sewell directly. Plaintiff Deposition, at 309.

However, plaintiff does claim that Sewell made a number of inappropriate comments to her. First, plaintiff asserts that in July of 1998, as plaintiff was rushing into the salesroom to get a key for a customer, Sewell said "Slow down. Your boobs are bouncing." *Id.* at 190. The comment embarrassed plaintiff, but she did not protest. *Id.* at 191. On another occasion, when plaintiff was talking about her longtime boyfriend, Roger Ward, Sewell approached and stated "Wouldn't you rather have a man like me?" *Id.* at 144. Sewell also stated that the only reason plaintiff would stay with her boyfriend would be for "the sex." *Id.* at 173. Sewell asserts that he only meant that plaintiff should find someone who could better meet her needs, but plaintiff took the comment to mean that Sewell wanted a relationship with her. On yet another occasion, Sewell allegedly told plaintiff that if she wanted to sell more cars and get a management position, she should wear shorter skirts and show more cleavage. *Id.* at 374. Sewell denies this comment and there were no other witnesses to this specific comment. Throughout defendant's brief, it makes much of the fact that plaintiff never complained to anybody in the corporate offices. Plaintiff contends, however, that in November of 1997 and again in June or July of 1998, Larry Sewell told her that, despite what Mike Steven told her during orientation, if she complained to Steven or anyone at the corporate offices about any dealership matters, he would terminate her. *Id.* at 55. Bill Martin testified to a similar understanding but stated that Sewell had never threatened him. Martin Deposition, at 134.

Plaintiff admits that she engaged in discussions at work about her and her daughter's enjoyment of nude sunbathing and "topless" fishing. Plaintiff Deposition, at 258–59. However, plaintiff notes that such conversations took place only between her and a female co-worker, Marcena Mitchell. *Id.* She asserts that the conversations only became known through Kyle Owens' eavesdropping of the conversation which occurred in plaintiff's office. *Id.*

Without any explanation to management, plaintiff left her employment with defendant. On January 27, 1999, plaintiff filed a complaint with the Equal Employment Opportunity Commission. In this action, plaintiff does not claim any damages for lost income or benefits, but only damages for psychological harm.

## II. Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the non-moving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. Analysis and Discussion

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, the United States Supreme Court held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ To establish a prima facie case of hostile work environment under Title VII, plaintiff must show that: (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. *Rahn v. Junction City Foundry, Inc.*, 152 F.Supp.2d 1249, 1256 (D.Kan.2001) (citing *Brandau v. State of Kansas*, 968 F.Supp. 1416 (D.Kan. 1997)).

Defendant concedes that, as a woman, plaintiff falls squarely within the protected class. However, defendant contends that plaintiff has failed to raise triable issues regarding the other four elements.

### A. Did Plaintiff Welcome the Behavior in Question?

■ "In order to constitute harassment the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir.1998). The question is whether, under the totality of the circumstances, plaintiff indicated by her conduct that the alleged harassment was unwelcome. *Meritor*, 477 U.S. at 69, 106 S.Ct. 2399.

■ The inherently subjective question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns primarily on credibility determinations which are inappropriate for summary judgment. However, defendant argues several objective facts which allegedly indicate that plaintiff welcomed the conduct about which she now complains. First, defendant argues that plaintiff's discussion of nude sunbathing and topless fishing in the work setting suggests that she welcomed conversations of a sexual nature. The court disagrees. As this court noted in *Rahn*, "[u]se of foul language or sexual innuendo in a consensual setting does not waive [plaintiff's] legal protections against unwelcome harassment." *Id.* at 1256 (citing *Burns v. McGregor Elec. Indus. Inc.*, 989 F.2d 959, 963 (8th Cir.1993)). Further, according to plaintiff's testimony, she intended to engage in such discussions only with a female coworker and that the conversations became more widely known only because Owens would eavesdrop on plaintiff. The context of the conversations thus does not suggest that plaintiff was, in any way, welcoming nonconsensual talk of a sexual nature from male coworkers.

■ Second, defendant asserts that plaintiff welcomed the behavior in question by not confronting the perpetrators of the behavior directly. The court finds this argument unpersuasive in the summary judgment context for two reasons. First, an employee who is afraid and intimidated by an alleged harasser will often be unwilling to confront the aggressor. Plaintiff claims on many occasions she was, in essence, playing dead, i.e., by ignoring the conduct in question, plaintiff held out the hope that the allegedly harassing activity would cease. Failing to respond to abuse does not equate to solicitation or incitement of such activity. Additionally, other employees were aware that the allegedly harassing treatment upset plaintiff. The

evidence suggests that, on several occasions, plaintiff expressed heightened emotional responses both in the form of exasperation and anger at the actions of Owens and Wolff. Such expressions suggest that plaintiff felt the actions were undesirable.

■ Next, defendant argues that plaintiff's failure to report the complained of conduct to defendant's management on a more frequent basis "provides some indication she did not consider it greatly offensive." *Hertenstein v. Kimberly Home Health Care, Inc.*, 58 F.Supp.2d 1250, 1257 (D.Kan.1999). Plaintiff responds by noting that she did complain to Sewell on at least two occasions. She complained to Sewell specifically about Owens' sexual innuendos, about Leshley's use of inappropriate language, and about Wolff's pinching and other physical contact. Plaintiff asserts that it would have been pointless to complain more frequently to Sewell because he was often present when the offending conduct occurred. Plaintiff did not complain to corporate headquarters, but seeks to excuse that failure by asserting that Sewell threatened her with loss of employment should she report the problems to anyone but him. While plaintiff's failure to make additional complaints to management is relevant in other contexts in this case, it simply fails to conclusively show, in light of the two complaints to Sewell and plaintiff's response to the alleged harassment, that plaintiff welcomed the behavior or that she did not regard it as offensive.

■ Defendant also claims that plaintiff encouraged some of the sexual innuendos by bringing or looking at a Victoria's Secret catalog and a Cosmopolitan magazine at the dealership. Plaintiff did possess the two publications in question. However, assuming the accuracy of plaintiff's deposition testimony, she did not make either the existence or contents of the publications known to her male coworkers. Her male

coworkers only became aware of the content of the publications after Owens obtained them from plaintiff's desk. As such, the court cannot construe plaintiff's mere possession of the publications as welcoming the allegedly offensive comments which were based upon the contents of the publications.

■ Finally, defendant argues that plaintiff could not have found her work environment to be offensive because she attempted to get her seventeen-year-old daughter a job at defendant's dealership. Plaintiff concedes that she asked Sewell about a job for Erica, but claims that Sewell made the initial suggestion. Plaintiff further argues that she would only allow Erica to work at the dealership if she worked at times when plaintiff could keep an eye on her. Plaintiff's thought process on this point does raise some question about her view of the work environment, but it does not prove, as a matter of law, that plaintiff welcomed the alleged abuse in this case. The fact finder must weigh and consider such facts so that they can fully assess the credibility of the various witnesses. The court finds, for purposes of this motion, that plaintiff did not welcome the conduct in question.

### B. Was the Alleged Harassment Based on Sex?

■ The court finds that only portions of the harassment alleged in this case are gender based. Sexual harassment is behavior " 'that would not occur but for the sex of the employee' ... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination." ' *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 (10th Cir.1995). The existence of sexual harassment must be determined "in light of 'the record as a whole' and [courts must examine] 'the totality of [the] circumstances, such as the nature of the

sexual advances and the context in which the alleged incidents occurred.' " *Meritor Savings*, 477 U.S. at 69, 106 S.Ct. at 2406. The mere utterance of a statement which " 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* at 67, 106 S.Ct. at 2405. Thus, plaintiff must show that the complained of actions would not have occurred but for her gender. A showing of mere offensive but gender neutral abuse is insufficient.

■ Plaintiff complains to a significant degree about cursing and profanity in the workplace. When profanity, even vulgarity, is uttered in a conversational manner directed to all who are present, it is not sexual harassment. Plaintiff's complaints regarding general profanity are thus not actionable under Title VII. However, plaintiff also testifies that Wolff referred to her directly as a "bitch" on several occasions. Sexual epithets that a female worker is a "whore" or a "bitch" are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that the employee is a woman, they can constitute a form of sexual harassment. *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996).

■ Another branch of plaintiff's complaints could be placed in the category of what she alleges to be inappropriate touching. This category includes complaints such as Wolff grabbing plaintiff's shoulders, Wolff pinching her arms and cheeks, both Wolff and Sewell grabbing her from behind in a restraining fashion, and Wolff cornering plaintiff in a hallway. There is significant testimony that Wolff grabbed or massaged the shoulders of both male and female sales personnel. The court finds such touching to be gender

neutral. *See Haug v. City of Topeka, Equipment Management Div.,* 13 F.Supp.2d 1153, 1161 (D.Kan.1998). Likewise, plaintiff admits that the cornering incident was not sexually motivated. However, the court characterizes plaintiff's remaining complaints as sexual harassment. The record suggests that Wolff did not pinch any other employees on the arm so as to cause pain or grab male employees from behind in a restraining manner. Similarly, the record does not indicate that Sewell grabbed other employees. Such actions were directed only at plaintiff, the only female employee in the relevant section of the dealership. If a female employee is physically harassed in a way that male employees are not, the unwelcomed touching is presumptively gender based.

■ The final category of plaintiff's complaints relates to jokes, statements, and sexual comments. Owens' "furburger" and "cherry bendover" comments as well as asking plaintiff to test the seat of a van are all obviously gender based. Equally obvious is the gender-based nature of comments relating to lower necklines, higher skirts, bouncing boobs, tickling panties, more suitable male companionship, see-through skirts, and sexual innuendo relating to the use of cigars. All of these complained of statements are clearly gender based and many were directed at plaintiff thus constituting sexual harassment.

## C. Was the Alleged Harassment Sufficiently Severe and Pervasive?

The Tenth Circuit has recently given the following guidance as to the proper analysis of this element:

> Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is "sufficiently severe or pervasive to alter the conditions [of the victim's] employment and create an abusive working environment."

*Lockard,* 162 F.3d at 1071, quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There is no "mathematically precise test" for determining whether the conduct is sufficiently severe or pervasive. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295. Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening. *See, e.g., Lockard,* 162 F.3d at 1072 (allowing claim based on single incident); *Smith v. NW Fin. Acceptance Corp.,* 129 F.3d 1408, 1413 (10th Cir.1997) (conduct must be "sufficiently pervasive or sufficiently severe"). The harassing conduct must be "both objectively and subjectively abusive." *Lockard,* 162 F.3d at 1071.

*Turnbull v. Topeka State Hosp.,* 255 F.3d 1238, 1243 (10th Cir.2001). This court has also noted that "verbal harassment alone can produce a sexually hostile work environment." *Huffman v. City of Prairie Village, Kan.,* 980 F.Supp. 1192, 1201 (D.Kan.1997).

■ Plaintiff has produced evidence that she was the target of repetitive sexual comments and innuendo from Owens, both physical and verbal harassment from Wolff, and verbal and physical harassment by Sewell. The totality of the circumstances alleged by plaintiff could provide the finder of fact with a reasonable basis upon which to find that she was subjected to a hostile work environment through sexual harassment. Defendant contests and

denies virtually all of plaintiff's complaints and, clearly, plaintiff must prove her claims at trial. For purposes of the present motion however, the court must view the facts in the light most favorable to plaintiff. Having done so, the court finds that plaintiff has raised a triable issue as to whether she was subjected to actionable sexual harassment.

### D. Can Plaintiff Establish a Basis for Imputing Liability to Defendant?

▉▉▉▉ The Tenth Circuit recognizes three bases, drawn from general agency principles, for holding an employer liable for hostile work environment based on a supervisor's or co-workers' sexual harassment: (1) where the conduct occurred within the transgressor's scope of employment, (2) where the employer knew, or should have known, about the violation and failed to respond in a reasonable manner, or (3) where the transgressor acted with apparent authority or was aided by the agency relation. *Wright–Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir.1998). Plaintiff makes several arguments for employer liability. First, plaintiff asserts that defendant is liable in that it knew, or should have known, about Owens' and Wolff's alleged harassment and failed to respond in a reasonable manner. Plaintiff also alleges that both Wolff and Sewell hold direct supervisory authority over plaintiff. Supervisory status is relevant in view of the Supreme Court's recent statement that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). When a supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassign-ment, then the imputation of liability to the employer is absolute. *Id.* Plaintiff thus argues that she suffered tangible employment action at the hands of Sewell and Wolff. On the other hand, defendant asserts that plaintiff quit her employment on a voluntary basis and was not subject to any tangible employment actions from her superiors. For purposes of this analysis, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. at 2268.

▉▉▉ When an employer takes no tangible employment action, it may raise an affirmative defense to liability. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Within this framework, the court will address several distinct yet related issues.

### 1. Liability for Non–Supervisory Harassment

▉▉▉▉ As noted above, an employer may be held liable for "negligence or reck-lessness in failing to respond to hostile work environment sexual harassment by employees." *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir.1990). This liability attaches when a plaintiff establishes that an employer had actual or constructive notice of the hostile work environment and failed to respond adequately to that notice. *See Harrison v. Eddy Potash, Inc.*, 112 F.3d 1437, 1444 (10th Cir.1997); *see also Creamer v. Laid-law Transit, Inc.*, 86 F.3d 167, 170–71

(10th Cir.1996) (holding that employer would be liable if it failed to remedy a hostile work environment brought about by sexual harassment of which it knew or should have known). A plaintiff demonstrates actual employer knowledge where the plaintiff has reported harassment to management-level employees. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir.1998). The court may infer that an employer had constructive knowledge of sexual harassment where the pervasiveness of the harassment supports such an inference. *Id.*

Defendant acknowledges that Sewell was plaintiff's primary supervisor in his position as the general manager of the dealership. It is also uncontested that on at least two occasions plaintiff complained directly to Sewell about Wolff's pinching and about the "furburger" and "cherry bendover" comments which Owens was repeatedly making. While defendant argues that plaintiff should have complained more or to different persons, the fact remains that Sewell had actual knowledge of the harassment. Additionally, the duration and frequency of the sexual comments and innuendo coupled with plaintiff's testimony that Sewell was often within hearing range of the comments supports an inference of constructive employer knowledge. The court finds that defendant was on notice that plaintiff's coworkers were speaking to plaintiff in an unwelcomed manner and thereby creating a hostile work environment.

■■■■ In addition to an employer's actual or constructive knowledge, the court must also consider the reasonableness of the employer's response to any harassment about which it knew or should have known. *Id.* To constitute a reasonable response, the employer's remedial and preventative action must be reasonably calculated to end the harassment. *Id.* at 676. According to plaintiff's testimony, when she complained to Sewell about Owens' comments, Sewell spoke with Owens. For a short period of time the comments were more limited, but then Owens resumed making the comments as before. Plaintiff believes that Sewell heard Owens' continuing abuse and failed to take further curative actions. Assuming plaintiff's testimony to be accurate, the court finds that defendant did not reasonably respond to the harassment about which it had actual knowledge. Similarly, defendant did little or nothing to remedy the harassment about which it had constructive knowledge. The court thus finds that plaintiff has raised a triable issue as to whether defendant is directly liable for its negligent failure to remedy abuse about which it had actual and constructive knowledge.

### 2. Wolff as Plaintiff's Supervisor

■■■■ Defendant argues that, for purposes of vicarious liability, Wolff is not plaintiff's supervisor and that therefore the court should not hold defendant vicariously liable for any of his harassing conduct. Plaintiff of course contends that Wolff was in fact a direct supervisor in his position as sales manager at the dealership. In the absence of evidence that Wolff was actually her supervisor, plaintiff's belief that he was a supervisor must be a reasonable one in order for supervisory vicarious liability to attach. *See Ellerth*, 524 U.S. at 759–60, 118 S.Ct. 2257. As an initial consideration, the court notes that Wolff's title (sales manager) suggests that he had some managerial authority as compared with the other sales personnel. While this is clearly not a conclusive consideration, it is relevant in establishing plaintiff's reasonable belief. Additionally, plaintiff testified that Wolff interviewed and hired her and that he told her to report directly to him on her first day. Plaintiff could obtain authority to close a sale through Wolff. Brent Sawdy testified as to his belief that Wolff terminated him

and plaintiff was aware of Sawdy's comprehension of his termination. Wolff had the authority to distribute house deals and to approve or disapprove potential sales. Martin also testified to his belief that Wolff had some supervisory authority over the other sales personnel. Clearly, there is a dispute as to whether Wolff was plaintiff's supervisor in that defendant expressly states that he had no authority to hire, fire, or adjust the compensation of other employees. Nonetheless, plaintiff has adduced sufficient evidence of his supervisory status to allow this issue to go to trial.

### 3. Sewell's Supervisory Harassment

■■ Defendant's reply brief argues that, even viewing the facts in a light most favorable to plaintiff, Sewell did not as a matter of law engage in harassing behavior. The court disagrees. Again assuming the accuracy of plaintiff's claims, Sewell made numerous comments that the court can construe as sexual harassment: by saying plaintiff's "boobs were bouncing," by telling plaintiff to get a better man such as himself, by telling plaintiff she would have more success if she lowered her blouse line and wore shorter skirts. Additionally, Sewell embraced plaintiff from behind on one occasion. While Sewell denies these allegations, the claims clearly present controverted facts which raise a triable issue as to whether Sewell engaged in harassing behavior. Defendant accurately points out that plaintiff did, at one point in her deposition, testify that Sewell never made any comments to her which offended her. While this fact does raise an issue as to the credibility of plaintiff's other claims relating to Sewell, it does not support a judgment as a matter of law that Sewell did not engage in any harassing behavior.

### 4. Ellerth/Faragher Affirmative Defense

■■■ Defendant's assertion of the Ellerth/Faragher affirmative defense as a

grounds for summary judgment fails for two reasons. First, plaintiff has raised a triable issue regarding whether she was subject to a tangible employment action. As noted above, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Plaintiff contends that she suffered two tangible employment actions at the hands of Sewell. First, Plaintiff seems to argue that her alleged constructive discharge ipso facto forms the basis of a "tangible employment action." *See* Plaintiff's Response, at 37. The court disagrees with such a characterization. The Supreme Court, in *Faragher* and *Ellerth,* was referring to significant changes in employment status, i.e., to situations in which the alleged harasser directly fired, demoted or reassigned the victim of harassment and that conduct formed part of the factual basis for the sexual harassment claim. As this court has previously noted in *Dunegan v. City of Council Grove, Kansas Water Dept.,* 77 F.Supp.2d 1192, 1199–1200 (D.Kan.1999), there is "no merit to plaintiff's suggestion that a constructive discharge falls within the definition of 'discharge' as set forth in *Ellerth.*" *Id. See also Mallinson–Montague v. Pocrnick,* 224 F.3d 1224, 1231–32 (10th Cir.2000) ("we conclude it unwise to merge the Supreme Court's specific language in *Faragher* and *Burlington* into the general umbrella concept of 'constructive discharge.'"); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 294 (2d Cir.1999) (holding that *Ellerth/Faragher*'s "tangible employment action" is not synonymous with "constructive discharge" and noting that not all constructive discharges will satisfy the *Ellerth/Faragher* standard).

Plaintiff also claims that Sewell used his position to deny her a potential sale from a

customer who came into the dealership with her business card. Martin testified that Sewell directed the customer to another sales person and threw away plaintiff's card. Sewell therefore gave the resulting sale and commission to another sales person. *See* Martin Deposition, at 126–27. Plaintiff claims that Sewell's action resulted in direct economic harm, i.e., a tangible employment action. In *Ellerth,* the Supreme Court approved of the Tenth Circuit opinion of *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (10th Cir.1993), wherein the Circuit stated that "If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing ..." *Id.* The Supreme Court did note, however, that the resultant economic injury must be "tangible," "significant," and/or "material," *Ellerth,* 524 U.S. at 760–61, 118 S.Ct. at 2268–69.

Plaintiff's allegations of lost commission are somewhat tentative in that plaintiff does not inform the court as to the actual amount of the lost commission. Absent such information, the court cannot fully determine whether the direct economic impact of Sewell's actions is significant or material. Further, defendant asserts that Sewell engaged in redirection of sales as a teaching tool with all employees and that such activity was in no manner a form of harassment. These, however, are controverted issues of fact on which the court cannot rule as a matter of law at this stage of the proceeding. The court thus finds that plaintiff has raised a triable issue as to whether the loss of commission constitutes a "tangible employment action."

■ Second, even assuming that plaintiff did not suffer a "tangible employment action," defendant has not established, as a matter of law, the applicability of the affirmative defense. As set forth above, the *Ellerth/Faragher* defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. The court finds that defendant has satisfied, as a matter of law, the first prong of the affirmative defense. Defendant provided all of its employees with an employee handbook which clearly established an anti-sexual harassment policy as well as a specific reporting procedure. Defendant required all employees to sign an independent form setting out the policy and the reporting procedure. Additionally, defendant made all new employees verbally aware of the policy through a reading of the policy and procedure in new employee orientations. These efforts to establish a company wide policy and to ensure that employees were aware of the policy constitutes an exercise of reasonable care in the prevention of sexual harassment.

■ Defendant has not established, however, that plaintiff unreasonably failed to take advantage of the reporting procedure provided by defendant. The defendant's employee manual states that employees who feel they were subjected to sexual harassment should report the conduct "to his/her supervisor or a corporate office manager." Def. Ex. 7, at 3. Defendant argues that it has met the second prong of the defense because plaintiff did not report the conduct to a corporate office manager and failed to report the offending conduct on a more regular basis. However, defendant seems to overlook that the reporting procedure establishes an alternative, i.e., the employee can report conduct to either a supervisor or corporate office manager. Plaintiff took advantage of defendant's policy by reporting the ha-

**1246**

rassing conduct to Sewell, her supervisor. Where an employee takes advantage of a reporting procedure, she cannot be said, as a matter of law, to have unreasonably failed to follow the corrective procedure even if she does not fully exhaust her reporting options within the policy. By reporting the allegedly harassing conduct to Sewell in accordance with the defendant's stated procedure, plaintiff created a factual issue as to whether she reasonably took advantage of the corrective opportunities which defendant provided. The *Ellerth/Faragher* affirmative defense is thus not an appropriate basis for summary judgment in this case.

### IV. Conclusion

Plaintiff has come forward with specific facts establishing triable issues as to whether she has established a prima facie case of Title VII sexual harassment and to whether defendant is entitled to assert the *Ellerth/Faragher* affirmative defense to liability. The court thus finds that summary judgment is inappropriate.

IT IS THEREFORE ORDERED this 26th day of September, 2001, that defendant's motion for summary judgment (dkt. no. 70) is denied.