# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview School District,     :
       :
            Appellant    :
       :
         v.        : No. 1144 C.D. 2018
       : Argued: February 12, 2020
Riverview Education Association,    :
PSEA/NEA        :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE J. ANDREW CROMPTON, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WOJCIK                  FILED: July 12, 2021


Following remand pursuant to *Riverview School District v. Riverview Education Association, PSEA/NEA* (Pa. Cmwlth., No. 634 C.D. 2017, filed January 5, 2018) (*Riverview I*), Riverview School District (the District) appeals from the order of the Court of Common Pleas of Allegheny County (trial court) denying the District's petition to vacate an arbitration award and affirming the award. By a June 28, 2016 opinion and award, an Arbitrator sustained in part, and denied in part, a grievance filed by Riverview Education Association and PSEA/NEA

---

[1]The decision in this case was reached before January 4, 2021, when Judge Leavitt served as President Judge, and before Judge Brobson started his service as President Judge.

(collectively, the Association) on behalf of Bernard Campbell (Grievant). More specifically, the Arbitrator sustained Grievant's grievance insofar as he was discharged, and directed that he be reinstated effective January 1, 2016. However, the Arbitrator denied Grievant's grievance as to his suspension without pay for the period from March 23, 2015, until December 31, 2015. Following remand by this Court, the trial court upheld this suspension as the appropriate penalty and concluded that the Arbitrator's award did not violate the public policy against sexual harassment in the workplace. We affirm.

## Facts and Procedural History

The facts as set forth in the Arbitrator's award may be summarized as follows. The District and the Association are parties to a collective bargaining agreement (CBA) effective July 1, 2014, through June 30, 2018. A dispute arose between the parties with regard to the termination of a professional employee, Grievant, who taught in the District's Tenth Street Elementary School. Grievant's wife is also employed by the District as a special education teacher. Reproduced Record (R.R.) at A199, A218.[2]

In June of 2012, Grievant had been admonished by the District Superintendent and directed to maintain proper, professional boundaries with a different female teacher. Subsequent thereto, the collegial relationship between Grievant and another teacher (Teacher), changed significantly. Grievant's visits to

_____

[2] We note that the designation of the pages in the Reproduced Record violate the requirements of the Pennsylvania Rules of Appellate Procedure (Pa. R.A.P.). *See* Pa. R.A.P. 2173 ("[T]he pages of . . . the reproduced record . . . shall be numbered separately in Arabic figures and not in Roman numerals: thus 1, 2, 3, etc., followed in the reproduced record by a small a, thus 1a, 2a, 3a, etc. . . ."). Nevertheless, we will refer to the pages of the Reproduced Record in this memorandum opinion as improperly designated by the District.

Teacher's classroom became more frequent; he tried to converse with her in closer proximity; and he presented her with gifts and correspondence suggesting they engage in a romantic relationship, even though both he and Teacher are married to other people. Grievant would also sit next to her and at times place his hand on her knee or kiss her head. Teacher rebuffed these actions by Grievant and repeatedly asked him to step back and leave her alone and/or get out of her classroom. While away on a college visit with her daughter, Teacher received several text and email messages from Grievant, which made her uncomfortable. Upon her return, Grievant left a package for Teacher with a stuffed mascot of the school that she and her daughter had visited, along with a note that she found odd and discomforting. Teacher discussed the situation with some colleagues, but did not confront Grievant regarding this incident. R.R. at A200-A204, A217.

In May of 2014, Grievant placed several photographs of Teacher's daughter, along with a Mother's Day card, in Teacher's personal book bag. Around Halloween, Grievant gained access to Teacher's locked classroom and decorated the room with Halloween decorations. In January of 2015, Grievant presented Teacher with a small box as a Christmas present, which included an oversized clothespin with her name, a note that said "hoodie," and a letter that included numerous references to his desire for a romantic relationship with her.[3] Grievant again expressed his desire for a relationship with Teacher in subsequent

---

[3] The letter was admitted into evidence before the Arbitrator and is reproduced in the Arbitrator's decision. The letter clearly expressed that Grievant had feelings for Teacher, whom he referred to throughout as "Bethie," noting that their relationship was "different than most," how her smile "had more to do with how we felt," how he and Teacher were "two people who cared a great deal for one another" and could have had a "much different relationship" given a different time and place, his desire to kiss her years ago, and the numerous times he "felt like kissing [her] and didn't." R.R. at A209-A210.

conversations. Teacher eventually sent an email to Principal David Zolkowski (Principal) complaining that Grievant's conduct crossed professional boundaries and intruded into her personal space. She noted that she had trouble sleeping and sought counseling from the Center for Victims. R.R. at A206-A212.

On January 29, 2015, Teacher filed a formal complaint against Grievant with the District. Principal and Dr. Ashley Coudriet, the District's Title IX Coordinator (Coordinator),[4] initiated an investigation and conducted personal interviews with numerous employees, including Teacher and Grievant. Principal and Coordinator reported their findings to the District's Superintendent, Dr. Margaret DiNinno (Superintendent). By letter dated February 12, 2015, the District advised Grievant that he was being placed on administrative leave with pay. R.R. at A222.

The District subsequently met with Grievant and his union representatives. By letter dated March 20, 2015, the District informed Grievant that he was being suspended effective March 23, 2015, without pay. On March 25, 2015, the Association filed a grievance on behalf of Grievant, alleging that the District violated the CBA by imposing discipline without just cause. The District thereafter opted to dismiss Grievant from employment and provided him with a Statement of Charges and a notice of hearing on July 25, 2015. The District charged Grievant with willful neglect of duties; persistent negligence in the performance of duties; persistent and willful violation of, or failure to comply with, school laws of the Commonwealth, including District policies and directives; immorality; and intemperance. The parties agreed that the grievance filed by

---

[4] Referring to Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-1688.

4

Grievant would serve as the continuing vehicle to address his unpaid suspension and pending termination. R.R. at A222.

**Arbitrator's Hearings and Award**

The Arbitrator conducted hearings on February 10 and March 18, 2016. Teacher testified that she worked for the District for 17 years, many of those years with Grievant, and that she is married with 4 grown children. While they often shared special education students and worked on projects together, Teacher stated that their collegial relationship started changing in 2013 as Grievant's visits to her classroom became more frequent and uncomfortable. Teacher explained that Grievant regularly engaged in non-work-related personal conversations and routinely invaded her personal space to the point where she asked him to step back. Teacher acknowledged that Grievant often brought her small token gifts, such as a candy bar or bottle of water, when she was having a bad day, and she often chatted with him over the same or with regard to computer issues she was having. However, Teacher noted that several times she received gifts that made her uncomfortable or Grievant would place his hand on her knee or kiss her head, to which she implored him to leave her alone. R.R. at A200-A202.

Teacher also acknowledged that Grievant had assisted her with filling orders at her husband's pierogi business on at least one occasion in the fall of 2013, and later in soliciting support via email for this business in a local magazine contest. However, Teacher described an incident occurring over a period of four days in April 2014, when she visited her daughter at college and Grievant sent her several text messages at or near midnight, including one asking her to let him know that she got home. Teacher testified that later that same week, she received a

package which included a stuffed mascot of her daughter's school and a floral card with a handwritten note from Grievant that made her feel very uncomfortable. After receiving this package, Teacher noted that she talked to Matt Schenle, a co-worker and Association representative (Representative), about it. While Representative was surprised to learn that the package came from a fellow teacher, he did not make plans to discuss the situation with Grievant. Nevertheless, Teacher herself spoke with Grievant the next week and informed him that she felt uncomfortable, and that his behavior was upsetting and out of line. Teacher noted that although Grievant insisted that he was just trying to be nice, she felt distracted the rest of the day. Teacher also testified that in May 2014, she received a note from Grievant that was addressed to "Bethie," a name that no one, including her husband, ever called her. R.R. at A202-A206.

Teacher explained that later in May 2014, around Mother's Day, Grievant had placed several photographs of her daughter and the daughter's dance team, along with a Mother's Day card, in her personal book bag without her knowledge. Although Teacher thought that it was a nice gesture, she felt that it was also strange that Grievant had kept copies of photos from a year ago when he assisted her with another project. Teacher personally told Grievant that his actions were inappropriate, he apologized, and she did not report him to the Association or the District. R.R. at A206.

Teacher acknowledged that during the next school year, 2014-2015, she requested Grievant's assistance with printing out a boarding pass from her computer and he obliged. Teacher noted that around Halloween, she was again uncomfortable because Grievant had gained access to her locked classroom and decorated for the occasion. Teacher talked to Grievant, but did not report his

6

actions to the Association or the District. Teacher stated that at the end of November, Grievant emailed her at a time when his daughter was undergoing surgery on her hand, and she believed him to be at the hospital with his wife. She felt that the email was awkward and discussed it with Representative, who suggested that she respond to Grievant and his wife, which she did. Subsequently, Teacher noted that Grievant questioned her as to why she did not respond further since she knew of the surgery and he really needed her at that time. Teacher testified that early in 2015, Grievant came to her classroom with a small box that contained an oversized clothespin with her name on it, a note that said "hoodie," and a card and letter discussing his romantic feelings for her. R.R. at A207-A210.

Teacher again felt uncomfortable and proceeded to show the letter to Representative, who advised her that the letter was wrong and that she needed to do something about Grievant's actions. Teacher stated that the next day, Grievant came to her classroom and inquired about the gift and letter, to which she responded that there was nothing to talk about and there was no relationship between them. Teacher noted that Grievant insisted that, if not for their respective spouses, they would be together. She described Grievant as becoming very agitated, frustrated, and argumentative. Teacher testified that, fearing for her safety, she emailed Principal on January 26, 2015. She stated that, after being unable to sleep because of the situation, and seeking advice from a friend, she sought help from the Center for Victims. R.R. at A210-A212.

Christine Maisto, a special education teacher who worked closely with Teacher, testified that she often observed Grievant in or near Teacher's classroom and that Teacher had asked her on occasion to go to her classroom or stay in the room with her because Teacher was uncomfortable with Grievant. She stated that

7

on the day Teacher received the box with the school mascot, she was asked to go to Teacher's room and Teacher appeared upset, shaken, and confused. She noted that while Grievant had informed her that he was concerned for Teacher, she advised Grievant that Teacher was capable of handling her students and that additional gifts were unnecessary. She described Teacher as increasingly nervous and upset after receiving the photographs of her daughter, which was impacting her teaching. She indicated that she and Representative read the letter from Grievant, that Teacher was obviously shocked and embarrassed by the letter, and that the letter was inappropriate and crossed the line. R.R. at A213-A214.

Representative testified that he worked at the same school as Teacher and Grievant as an elementary teacher and served as the building representative for the Association. He stated that he, too, often observed Grievant entering or leaving Teacher's classroom and often witnessed Teacher asking Grievant to leave the room. Representative described the gift of a stuffed mascot as very inappropriate and observed that Teacher was upset after receiving it. He noted that he advised Teacher that she needed to do something about it, but recognized it was a difficult situation involving two teachers. He also described Teacher as troubled by receipt of the Mother's Day card and photographs of her daughter. Regarding the letter written by Grievant, Representative stated that he never witnessed any behavior between Teacher and Grievant that would indicate they were in a relationship and that Teacher's interest was purely professional. He noted that the letter was wrong and suggested that he would accompany Teacher to report the same to the administration when she was ready to do so. R.R. at A214-A215.

Superintendent testified that she first became aware of the situation upon notice from Principal and she felt that the situation warranted further

8

investigation. Superintendent stated that, on or about February 9, 2015, she received a copy of the romantic letter that Grievant sent to Teacher and immediately contacted the District's solicitor. Superintendent explained that Grievant was placed on paid administrative leave at that time. She noted that, after meeting with the District's solicitor, Teacher, and Grievant, the District convened a *Loudermill*[5] hearing and converted Grievant's leave to an unpaid leave. Superintendent explained that the conversion to unpaid leave was based on the romantic letter, as well as the unwelcome gifts and cards, which Teacher received from Grievant. She also noted that Grievant had signed an acknowledgment when he received the District's harassment policy. She emphasized that he had been previously warned in June of 2012 to remain professional and to maintain social distance from another employee to ensure that nothing new, inappropriate, or ambiguous occurred with respect to the relationship between him and the other employee. R.R. at A215-A217.

Superintendent stated that, after the conclusion of the District's investigation and consultation with the solicitor, she determined that Grievant's conduct was inappropriate and impacted not only Teacher, but other teachers as well. She described Grievant's behavior as affecting Teacher's work and consuming her time. She was aware of the collegial friendship between Teacher and Grievant over the years, but noted that Grievant seemed to progressively transform it into a more intense and one-sided relationship, which he refused to stop even after being told that it was inappropriate, and which culminated in the

---

[5] Referring to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), which requires that a grievant be given notice and an opportunity to respond to any charges levied against him in a formal hearing before being terminated.

romantic letter. Hence, Superintendent decided to terminate Grievant's employment. R.R. at A217.

Grievant testified on his own behalf, noting his 20 years of employment with the District, his marriage to a fellow special education teacher, and his work with special needs students. R.R. at A218. He stated that he and Teacher often had six or seven special needs students in common and that they regularly discussed these students. *Id.* He stated that on many occasions, he assisted Teacher with both work-related and non-work-related tasks and that he considered her a friend. *Id.* Grievant denied that Teacher ever asked him to stop visiting her classroom or told him that she felt uncomfortable. *Id.* He testified that the gifts were meant to cheer Teacher up because she was having difficulty with a certain student. *Id.* He denied ever discussing a sexual relationship with Teacher, but he did not deny having sent the romantic letter. However, he described the letter as "just ramblings and things that he should have never written." *Id.* at A219. He stated that the letter was not meant to upset Teacher and was written when he "wasn't at a good place at the time." *Id.* He expressed that he was "truly sorry" to have upset Teacher, and that he believed that he could still work in the same building with her, strictly as teachers. *Id.*

In a 77-page decision, the Arbitrator extensively reviewed the testimony of each witness and carefully considered the arguments presented by the parties. R.R. at A198-A275. In particular, the Arbitrator thoroughly recounted the evidence concerning Grievant's conduct and Teacher's responses. Ultimately, the Arbitrator determined that the conduct at issue did not constitute sexual harassment, harassment, or creation of a hostile work environment, warranting Grievant's discharge rather than a lesser penalty. *See id.* at A245-A258.

10

The Arbitrator first addressed the parties' arguments concerning sexual harassment, noting that he disagreed with both of their positions. The Arbitrator explained that the cases cited by both parties regarding sexual harassment[6] involve either an individual transgressor who, by virtue of either supervisory or managerial authority, engaged in such conduct, or an employer that permitted such conduct to occur without intervention. R.R. at A263. The Arbitrator observed that Grievant was a colleague of Teacher with absolutely no authority or power over her. *Id.* He noted that there was no groping, no sexual contact, no offers of *quid pro quo*, and no demeaning or other unlawful conduct based on sex. *Id.* The Arbitrator considered that the District's relevant policies define "sexual harassment" as "unwelcome sexual advances; requests for sexual favors; and other inappropriate verbal, written, graphic or physical conduct of a sexual nature" and "harassment" as "verbal, written, graphic or physical conduct relating to an individual's race, color, national origin/ethnicity, sex, age, disability, sexual orientation, religion or genetic information . . . ." *Id.* at A224.

The Arbitrator further determined that none of Grievant's conduct could be characterized as immoral or shocking the conscience of the community, which was by all accounts totally unaware of it. R.R. at A263. For these reasons, the Arbitrator found that Grievant's conduct, although inappropriate and unwelcome, did not constitute sexual harassment. *Id.*

---

[6] The Arbitrator cited, *inter alia*, *Farager v. City of Boca Raton*, 524 U.S. 775 (1998); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996); *Stroehmann Bakeries v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir. 1992); *Horosko v. School District of Mt. Pleasant Township*, 6 A.2d 866 (Pa. 1939); and *Lesley v. Oxford Area School District*, 420 A.2d 764 (Pa. Cmwlth. 1980).

The Arbitrator next considered whether Grievant's conduct constituted harassment or the creation of a hostile work environment, which he analyzed as intertwined issues. The Arbitrator began by noting that Grievant and Teacher were colleagues for about 15 years before April 2014, when the first of a series of specific incidents occurred. R.R. at A264.

The Arbitrator found that Grievant was trying to be thoughtful when he purchased a stuffed toy from the university store in Ohio where Teacher's daughter was a student and had it delivered to Teacher following her visit with her daughter at school. R.R. at A264. Acknowledging that Teacher was upset with the idea that Grievant might have been on campus, the Arbitrator nevertheless determined that the gift, which could not have been expensive, was never returned, and was accompanied by a letter expressing good wishes, did not constitute harassment or the creation of a hostile workplace. *Id.* at A265.

A month later, in May 2014, Grievant deposited digital photographs of Teacher's daughter, with other members of her cheerleading or dance team, into Teacher's tote bag, along with a note wishing Teacher a happy Mother's Day. R.R. at A266. In addressing this incident, the Arbitrator recognized that, while Teacher thought it was a nice gesture, she also was annoyed and troubled by the unwelcome gift. However, the Arbitrator found that the inappropriate act could not objectively support a response of fear or apprehension. *Id.*

Subsequently, during October of the following school year, Grievant purchased Halloween decorations and delivered them to Teacher's classroom. The Arbitrator observed that the decorations were not scary or otherwise inappropriate. R.R. at A266. The Arbitrator acknowledged Teacher's objection to Grievant entering her locked classroom in order to deliver the decorations, but noted there

12

was no testimony that Grievant picked or broke the lock to obtain entry. *Id.* The Arbitrator found that Grievant delivered an innocuous gift and that doing so was neither harassment nor the creation of a hostile work environment. *Id.* at A266-A267.

In November 2014, while Grievant and his wife were in a surgical waiting room during their daughter's hand surgery, Grievant sent several text messages to Teacher stating that the waiting was hard. R.R. at A267. Teacher consulted with a coworker, and then sent an email to Grievant and his wife expressing her support. The Arbitrator stated that Grievant's subsequent statement to Teacher, "I needed you," reflected that Grievant believed he had a special relationship with Teacher, but did not form a basis for discipline. *Id.* Similarly, the Arbitrator found that Grievant's mistaken belief that the Christmas gift he received from Teacher was "regifted" was not a cognizable event to support discipline. *Id.*

The Arbitrator devoted more attention to the nine-page handwritten letter Grievant wrote to Teacher in January 2015. The Arbitrator found that the letter expressed a "long[ing] for more interaction and reciprocal expression of affection and a restoration of the relationship Grievant thought had previously existed." R.R. at A267-A268. The Arbitrator noted that the letter "contains no sexual overtones and no prediction of adverse consequence if his quest for a further warming of their relationship does not occur." *Id.* at A268. The Arbitrator characterized it as Grievant's first "love letter," adding that this was "not the first time in the history of professional relationships that one party seriously misinterpreted collegiality for love, or mistakenly intermingled personal and professional interactions for romantic reasons." *Id.*

13

The Arbitrator concluded that the letter was "at a minimum an exercise of poor judgment" and that the letter's contents understandably upset Teacher. R.R. at A268. The Arbitrator stated that, "Grievant should have anticipated that it would disturb" Teacher and, therefore, he should not have written or delivered the letter. *Id.* However, the Arbitrator determined that the letter itself did not constitute either harassment or a hostile work environment, or a violation of the District's policy. *Id.*

Finally, the Arbitrator cited the "box of inexpensive gifts" Grievant gave Teacher, describing the gifts as conduct that "further underscores Grievant's misconception of his relationship with Teacher," but not sexual harassment, harassment, or the creation of a hostile work environment. R.R. at A269.

Nevertheless, the Arbitrator agreed that Grievant's actions were misconduct for which some discipline, short of discharge, was warranted. The Arbitrator reviewed the Statement of Charges[7] and concluded that none of Grievant's conduct conformed to the charges lodged by the District. R.R. at A271. Additionally, the Arbitrator noted that the Statement of Charges relied in part on a June 1, 2012 letter from the District to Grievant relating to a prior matter with a former female colleague. *Id.* at A272. In particular, the Arbitrator noted that the letter was not phrased as a written warning or a disciplinary letter. Consequently, citing the absence of clear warnings or directives from supervisors or administrators, the Arbitrator stated he could not conclude that Grievant's conduct

---

[7] "You are being charged by [the District] with willful neglect of duties; persistent negligence in the performance of duties; persistent and willful violation of or failure to comply with school laws of the Commonwealth, including District policies and District directives; immorality and intemperance; all as defined under the [Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§1-101 - 27-2702]." R.R. at A271.

14

constituted persistent negligence, persistent or willful failure to follow District policies and directives, or immorality as a basis for removal under Section 1122(a) of the School Code, 24 P.S. §11-1122(a).[8] *Id.*

The Arbitrator did conclude that Grievant should have realized that his attention to Teacher was unwelcome and should have suppressed his feelings. Considering the conduct in its context, the Arbitrator added: "To be sure, [Teacher] welcomed his computer assistance and their collegial relationship, which at times may have confused Grievant to believe that it was romantic affection. It is also clear that [Teacher] never specifically told Grievant that his attention was unwelcome. She admitted that at the hearing." R.R. at A272-A273. Importantly, the Arbitrator "[did] not fully credit [Teacher's] continued allegation that Grievant made her angry, scared and frustrated, when she continued to interact with him on a friendly basis and seek his assistance." *Id.* at A273. Additionally, the Arbitrator noted that Teacher did not return any of the gifts Grievant gave her, and that neither of the two coworkers who spoke to Grievant specifically told Grievant to modify his conduct. *Id.*

Nevertheless, the Arbitrator determined that Grievant did not respect the boundaries described by the previous school superintendent, which represented generally accepted rules of professional behavior, stating that Grievant "can be faulted for his conduct without regard to the former [s]uperintendent's advice," but finding that Grievant's conduct was not harassment or the creation of a hostile

---

[8] Section 1122(a) of the School Code states, in relevant part:

> (a) The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality . . . in the performance of duties [or] willful neglect of duties; . . . ; on the part of the professional employe[.]

15

work environment. R.R. at A273. Based on those findings, the Arbitrator determined that a suspension without pay until December 31, 2015, approximately nine months, was the appropriate discipline. *Id.* at A274. The Arbitrator explained that such a suspension was "sufficiently long to clearly demonstrate to Grievant that his conduct was inappropriate, annoying, and should never recur." *Id.*

**Trial Court and Commonwealth Court Appeals**

Thereafter, the District filed a petition to vacate the Arbitrator's award with the trial court. By order dated April 12, 2017, the trial court denied the District's petition, concluding that the Arbitrator's decision drew its essence from the CBA and did not violate public policy. The trial court went on to state in this order that Grievant's "misconduct, while serious, was not so egregious that public policy prohibited his reinstatement with a lengthy suspension" and that "the law does not require termination of employees in every case of sexual harassment," citing this Court's decision in *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 956 A.2d 477 (Pa. Cmwlth. 2008), *aff'd*, 52 A.3d 1117 (Pa. 2012). The District thereafter filed a notice of appeal with this Court.

By decision and order dated January 5, 2018, this Court vacated the trial court's order and remanded the matter to the trial court for it to reconsider the District's claims and specifically address whether Grievant's actions constituted sexual harassment, and if so, whether the Arbitrator's award violated the public policy against sexual harassment in the workplace. *See Riverview I.*

16

**Trial Court's Decision on Remand**

By opinion and order dated July 16, 2018, the trial court denied the District's petition to vacate the arbitration award and affirmed the award of the Arbitrator as to the penalty imposed, but concluded that Grievant's actions toward Teacher did constitute "obvious sexual harassment." Trial Court 7/16/18 Op. at 4. Despite this conclusion of law, the trial court noted that the question in these types of cases is whether "the Arbitrator's penalty, given the totality of the harasser's conduct and its effect on the victim, is so lenient that it poses an unacceptable risk of undermining the well-defined and dominant public policy against sexual harassment in the workplace." *Id.*

The trial court cited to federal cases where arbitration awards that directed reinstatement of a sexual harasser after 11-month and 9-month unpaid suspensions, respectively, did not violate public policy. *See Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821 (5th Cir. 2001); *Westvaco Corporation v. United Paperworkers International Union, AFL-CIO*, 171 F.3d 971 (4th Cir. 1999). In the trial court's view, "the substantial penalty [the Arbitrator] imposed did not make a 'mockery of the dominant public policy against sexual harassment'. . . [n]or did it undermine said policy." Trial Court 7/16/18 Op. at 8. Nonetheless, characterizing Grievant's actions as egregious, the trial court indicated that it was not as egregious as the conduct in *Philadelphia Housing Authority* or *Neshaminy School District v. Neshaminy Federation of Teachers*, 171 A.3d 334 (Pa. Cmwlth. 2017), which involved physical and verbal abuse, *i.e.*, groping/grinding and nasty/vulgar comments to the victims. The trial court also noted that Grievant was not Teacher's superior, but a co-equal employee of the District.

With respect to the District's anti-harassment policy and its duty to protect employees, including Teacher, from sexual harassment under Title IX, Section 5(a) of the Pennsylvania Human Relations Act (PHRA)[9] and Section 1122(a) of the School Code, the trial court concluded that "reinstatement of [Grievant] after a nine[-]month unpaid suspension would not violate the prohibition against sex-based discrimination." Trial Court 7/16/18 Op. at 10. The trial court noted that the District agreed in a remand brief that neither Title IX nor the PHRA requires termination in a case of sexual harassment, and distinguished *Neshaminy School District* as involving "far more egregious facts and a lenient arbitration award," and *Bethel Park School District v. Bethel Park Federation of Teachers*, 55 A.3d 154 (Pa. Cmwlth. 2012), which involved the termination of a grievant for unwelcome touching of students. Trial Court 7/16/18 Op. at 10. Although the District contended that sexual harassment was immoral, such that termination was proper under Section 1122 of the School Code, the trial court held that the Arbitrator "had the authority to substitute a reasonable penalty." *Id.* The District again filed a notice of appeal to this Court.

**Discussion**

On appeal, the District argues that the trial court erred in failing to vacate the Arbitrator's award because (1) the award violates the public policy against sexual harassment in the workplace, and (2) the trial court failed to take

---

[9] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §955(a). In deciding sexual harassment cases under the PHRA, Pennsylvania courts look to federal court decisions interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5(e). *Hoy v. Angelone*, 691 A.2d 476, 480 (Pa. Super. 1997), *aff'd*, 720 A.2d 745 (Pa. 1998).

into account the independent grounds for termination under Section 1122(a) of the School Code.

## 1. Violation of Public Policy

In general, grievance awards are reviewed under the deferential essence test. As this Court has explained:

> In reviewing an arbitration award, this Court applies the highly deferential two-prong "essence test." *Chambersburg Area School District v. Chambersburg Education Association (Professional)*, 120 A.3d 407, 412 (Pa. Cmwlth. 2015). First, we decide whether the issue is encompassed by the [CBA]. Second, if the arbitrator's interpretation can rationally be derived from the [CBA], it will be sustained. As we have explained:
>
> > We are not required to agree with the arbitrator's interpretation of the [CBA], but we must "look at whether that interpretation and application of the agreement can be reconciled with the language of the agreement. We may vacate an award only if it indisputably and genuinely is without foundation in, or fails to logically flow from, the [CBA]."
>
> *Id.* [(citation omitted)]. "[I]n the vast majority of cases, the decision of the arbitrator shall be final and binding upon the parties." *Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, [210 A.3d 993, 1002 (Pa. 2019)] (quotation omitted).[10] The essence test is "a narrow exception to

---

[10] By December 18, 2019 order, we directed the parties to file supplemental briefs addressing the following:

1.  In [*Millcreek Township School District*], the Pennsylvania Supreme Court advanced a three-part test for applying the public

**(Footnote continued on next page…)**

this finality doctrine." *Id.*

*Slippery Rock University of Pennsylvania v. Association of Pennsylvania State College and University Faculty*, 241 A.3d 1278, 1284 (Pa. Cmwlth. 2020) (*Slippery Rock University*).

Further, an arbitrator has broad authority to fashion a remedy: "When an arbitrator is commissioned to interpret and apply the [CBA], he is to bring his informed judgment to bear in order to reach a fair solution of a problem. *This is especially true when it comes to formulating remedies*. There the need is for flexibility in meeting a wide variety of situations." *Midland Borough School District v. Midland Education Association,* 616 A.2d 633, 635 (Pa. 1992) (emphasis added and citation omitted). *See also Rose Tree Media Secretaries & Education Support Personnel Association v. Rose Tree Media School District*, 136 A.3d 1069, 1080 (Pa. Cmwlth. 2016) (*Rose Tree Media*) (absent a clear limitation in the CBA, it is within an arbitrator's authority to modify the discipline imposed by a school district).

"In cases where a court finds that the essence test is satisfied, the court may then consider whether the award violates a well-defined and dominant public policy of the Commonwealth." *Slippery Rock University*, 241 A.3d at 1284-85.

---

**(continued…)**

policy exception to the essence test. Address the impact of the Supreme Court's decision upon this appeal.

2. Under the third prong of the public policy exception articulated by the Supreme Court, *i.e.*, whether "the arbitrator's award compels the employer to violate the implicated policy," address to what extent the reviewing court must consider whether the arbitrator's penalty will deter future offending conduct by the grievant or other employees.

20

"The burden of establishing a violation of public policy rests on the party asserting the public policy exception." *Id.* at 1285 (citation omitted). As this Court has observed:

> The Pennsylvania Supreme Court has explained the public policy exception is a "narrow exception to a narrow exception," *i.e.*, the essence test. *Millcreek Township School District*, 210 A.3d at 1011. The Supreme Court has established a three-part test for applying the public policy exception:
>
> > First, a reviewing court must identify precisely what remedy the arbitrator imposed. . . . Next, the court must inquire into whether that remedy implicates a public policy that is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . ." Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.
>
> *Id.* (citations omitted). Notably, "the arbitrator's interpretation of the contract controls during this entire analysis . . . and should be upheld absent a clear violation of public policy." *Id.*

*Slippery Rock University*, 241 A.3d at 1285.

The District asserts that the Arbitrator's award violates the well-defined and dominant public policy against sexual harassment, "as ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Millcreek Township School District*, 210 A.3d at 1011. It is well-settled that in the course of this review, we are not to reweigh the evidence or disturb the arbitrator's findings. *Rose Tree Media*, 136 A.3d at 1078;

*Shamokin Area School District v. AFSCME District Council 86*, 20 A.3d 579, 581 (Pa. Cmwlth. 2011).

In *Rose Tree Media*, we emphasized that "reviewing courts are prohibited from second-guessing an arbitrator's findings of fact simply because they disagree with them." 136 A.3d at 1078. We firmly rejected "the employer's contention that a court must conduct a *de novo* review of the arbitrator's findings in cases subject to the essence test," and made clear that "an arbitrator's findings of fact are not reviewable on appeal as long as the arbitrator construed or applied the [parties' CBA]." *Id.* (citation omitted). *See also Millcreek Township School District*, 210 A.3d at 1014 ("Under the highly deferential essence test and its exceptionally narrow public policy exception, when reviewing the propriety of the arbitration award, the Commonwealth Court was required to rely on the arbitrator's findings of fact . . . .").

Before we addressed the public policy exception in *Rose Tree Media*, we held:

> [I]n resolving the issue of whether an arbitrator's award violates a well-defined, dominant public policy, there is usually no reason for a reviewing court to reexamine the transcript of the arbitrator's hearing and reevaluate the facts. Rather, only the award itself, and the legal authority supporting the implication of the public policy, are relevant to a public policy exception inquiry. To hold otherwise would result in routine review of the entire factual record every time a public employer raises the public policy exception.

136 A.3d at 1078-79. With these admonitions in mind, we review the Arbitrator's findings concerning the nature of Grievant's conduct.

Notably, the Arbitrator balanced his descriptions of Grievant's frequent, unwelcome visits and gifts to Teacher with observations concerning their

22

context. In evaluating the complained-of incidents separately, the Arbitrator considered the totality of the circumstances within which Grievant and Teacher worked and communicated. Significantly, the Arbitrator recognized the passage of time between these incidents during which Grievant and Teacher often engaged in normal and not unpleasant interactions as colleagues, both within the school environment and beyond the school walls.

For example, the Arbitrator noted Teacher's testimony that after Grievant gave her the stuffed toy gift,

> [Teacher] was perplexed because over the years, she had many appropriate and positive conversations with Grievant [sic] many collegial work matters. She knew his children and Grievant knew about her children. She later described the relationship with all of the teachers as "cozy" in that they all work together well. The faculty knew about each other's personal lives, such as the names and ages of their children, and any medical or social issues. The knowledge of personal lives coexisted with their professional lives. It was the culture of the building.

R.R. at A204-A205. The Arbitrator noted that in 2013, Teacher asked Grievant to assist her with graduation invitations on the computer and that she gave Grievant graduation pictures from her children's school. *Id.* at A205.

The Arbitrator noted Teacher's testimony that Grievant's visits to her classroom increased over time, became increasingly unwelcome, and, consequently, by April and May of 2014, Teacher "*perceived that the nature of their relationship in his mind had changed* and *she endeavored to maintain a friendship* as well as a professional relationship with him.*" R.R. at A204 (emphasis added). But the Arbitrator specifically cited the District's position that "[u]ntil Grievant gave [Teacher] the lengthy letter in January 2015, [she] had no

23

'evidence' that he was acting out of some sort of amorous interest, or that he perceived that there was some sort of amorous relationship between them." *Id.* at A232. Teacher testified that the letter, and her conversations with Grievant over the next two days, made her realize that "she was seeing the world differently than Grievant." *Id.* at A233.

The Arbitrator did not minimize Grievant's actions or the cumulative effect that they inflicted upon Teacher. The Arbitrator carefully considered the conduct of both parties over the course of the 18 months leading up to Grievant's suspension and concluded that the District had not established sexual harassment. The Arbitrator's findings support this conclusion, and those findings are supported by the record. Furthermore, because the Arbitrator did not credit Teacher's testimony that Grievant made her angry, frustrated, or frightened, the Arbitrator properly concluded that the District failed to establish harassment, or the creation of a hostile work environment.

Importantly, as outlined above, when our Supreme Court adopted the public policy exception to the essence test, it made clear that such public policy "must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Millcreek Township School District*, 210 A.3d 1011.

Thus, in addition to the District's policy defining sexual harassment, we look to applicable law. In *Philadelphia Housing Authority*, we stated:

> It now is well established that there is an explicit, well-defined, and dominant public policy against sexual

24

harassment in the workplace.[11]   Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex.   42 U.S.C. §2000e-2.   The Equal Employment Opportunity Commission (EEOC), which administers and enforces this provision, has promulgated regulations that define sexual harassment under Title VII and *provides that unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment (a form of sex discrimination) when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment*.   29 C.F.R. §1604.11(a).

\* \* \*

Section 5(a) of the [PHRA] also prohibits discrimination on the basis of sex and has been interpreted to include sexual harassment that is *severe or pervasive enough to create a hostile work environment*.   43 P.S. §955(a).

*Philadelphia Housing Authority*, 956 A.2d at 483-84 (emphasis added).

Our appellate role is to determine whether the Arbitrator's award satisfies the essence test, and, if so, *whether the Arbitrator's award* of modifying Grievant's discipline to a nine-month suspension without pay contravenes an established public policy.   Reviewing the record with reference to the District's policy and relevant law, *Millcreek Township School District*, 210 A.3d at 1011, we note the *absence* of:   unwelcome sexual advances; requests for sexual favors; sexually charged innuendo; suggestive or lewd remarks; horseplay of a sexual

---

[11] As support, the trial court cited *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir. 1992); *Chrysler Motors Corporation v. International Union, Allied Industrial Workers of America, AFL-CIO*, 959 F.2d 685 (7th Cir. 1992); *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL-CIO*, 915 F.2d 840 (2d Cir. 1990).

nature; or other inappropriate verbal, written, graphic or physical conduct *of a sexual nature*. *Philadelphia Housing Authority*, 956 A.2d at 483-84, 486 n.16.

Based on the Arbitrator's findings, the nature of Grievant's misconduct, while unquestionably inappropriate, is more akin to the expression of unrequited affection rather than sexual harassment as defined in policy or law. In light of the deferential standard of review stated by the Supreme Court in *Millcreek Township School District*, we are constrained to conclude that the Arbitrator's award does not contravene the public policy against sexual harassment, and that the public policy exception does not apply in this matter.[12]

## 2. Termination under Section 1122(a) of the School Code

Finally, the District asserts that Grievant was properly discharged on the independent basis of his violation of Section 1122(a) of the School Code. Specifically, the District contends that Grievant's course of conduct supports the determination that he violated Section 1122(a), which outlines the "valid causes for termination of a contract heretofore or hereafter entered into with a professional employe" as including "immorality . . . in the performance of duties [or] willful

_____

[12] Because the Arbitrator's award does not compel the District to violate the purportedly implicated public policy against sexual harassment, we need not consider whether the Arbitrator's penalty will deter future offending conduct by Grievant or other employees. Additionally, even if sexual harassment as so defined had been established, the nine-month suspension without pay does not pose an unacceptable risk that that discipline will undermine the well-established public policy against sexual harassment in the workplace, "*given the particular circumstances at hand and the factual findings of the arbitrator.*" *Neshaminy School District*, 171 A.3d at 338 (emphasis added). As outlined above and as the Arbitrator noted, the "circumstances at hand" include a 15-year working relationship in a workplace where professional relationships included shared information of employees' personal lives; the exchange of unwanted gifts as well as asked-for favors; and, as Teacher recognized, a misunderstanding by Grievant as to the nature of their personal relationship.

26

neglect of duties; . . . on the part of the professional employe[.]" 24 P.S. §11-1122(a).[13]

> As a preliminary matter,

> [t]his Court has explained that the purpose of Section 1122 is to provide "the greatest protection possible against dismissal." *Lauer v. Millville Area School District*, 657 A.2d 119, 121 (Pa. Cmwlth. 1995). Stated otherwise, Section 1122 was not intended to provide a school district with an arsenal of weapons to use when it wishes to relieve itself of its contractual obligations to a professional employee. As explained in *Lauer*, to dismiss a professional employee protected by contract requires a serious reason, not "picayune and unwarranted criticisms." *Id.* at 123. In short, the grounds for dismissal listed in Section 1122 must be strictly construed in favor of the professional employee and against the school district.

*McFerren v. Farrell Area School District*, 993 A.2d 344, 353 (Pa. Cmwlth. 2010).

> As this Court has observed:

> Immorality is not defined in the [] School Code. Our appellate courts have defined "immorality" as conduct that "offends the morals of the community and is a bad example to the youth whose ideals a teacher is

---

[13] In this appeal, the District does not address the other bases for Grievant's discharge that the District listed in the Statement of Charges. As a result, any claims in this regard have been waived for purposes of appeal. *See, e.g.*, Pa. R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); *Commonwealth v. Spotz*, 716 A.2d 580, 585 n.5 (Pa. 1998) (holding that the failure to develop an issue in appellate brief results in waiver under Pa. R.A.P. 2119(a)); *In re Estate of Ryerss*, 987 A.2d 1231, 1236 n.7 (Pa. Cmwlth. 2009) (holding that arguments not properly developed in an appellate brief will be deemed waived by this Court under Pa. R.A.P. 2119(a)); *Lackner v. Glosser*, 892 A.2d 21, 29-30 (Pa. Super. 2006) (holding that the failure to cite pertinent authority results in the waiver of an issue under Pa. R.A.P. 2119(a)).

supposed to foster and to elevate." To establish immorality, the school district must prove three elements: (1) that the alleged immoral act actually occurred; (2) that the act offends the morals of the community; and (3) that the act sets a bad example for students. The moral standards of the community will not be presumed; they must be proved by substantial evidence. Immoral conduct is something more serious than unprofessional conduct.

*Id.* at 353-54 (citations omitted).

Additionally,

[f]or a violation of a school law to be willful, the district must show that the employee knew of the school district's policy in question and deliberately chose not to comply. In *Cowdery v. Board of Education of the School District of Philadelphia*, [531 A.2d 1186, 1188 (Pa. Cmwlth. 1987)], this Court held that a teacher's continued violation of the board's sick-leave policy was not willful because the teacher did not know of this policy. Likewise, in *Belasco v. Board of Public Education of the School District of Pittsburgh*, [510 A.2d 337, 339 (Pa. 1986)], our Supreme Court held that because a teacher had not been informed that giving a student a "love tap" with a wooden paddle violated the school district policy against corporal punishment, the teacher's conduct was not a willful violation of school law.

*Id.* at 357.

More specifically, as this Court has explained:

To dismiss a professional employee for willful neglect of duties, a district must show that the employee intentionally disregarded his known duties. *Flickinger v. Lebanon* [*School District*], 898 A.2d 62, 67 (Pa. Cmwlth. 2006) (holding that the failure of a principal to immediately respond to the report of a gun in the school was a choice that he made as he knew he was required to respond immediately to a report of a gun and, therefore, his conduct constituted willful neglect of duty as it placed

28

the students in danger); *Williams v. Joint Operating [Committee] of the Clearfield [County] Vocational-[Technical School]*, 824 A.2d 1233 (Pa. Cmwlth. 2003) (holding that assistant director's act of opening bids before the bid submission deadline and discussing the content of the bids with one of the bidders of the project was a willful neglect of duty because doing so was illegal).

*School District of Philadelphia v. Chek* (Pa. Cmwlth., No. 1266 C.D. 2019, filed July 7, 2020), slip op. at 9-10.[14]

Moreover, as this Court has stated:

[C]onsistent with our limited review in labor grievance appeals, the arbitrator's award was rationally derived from the CBA and thus satisfied the essence test. Under the essence test, this Court may not undertake a review of the merits or reasonableness of the mitigating factors that the arbitrator relied upon here. Our case law makes clear that an arbitrator is permitted to depart from the discipline chosen by the employer except where language of the CBA directly forbids the arbitrator from such a determination. The District does not identify any provision in the CBA here that would limit the scope of the arbitrator's authority to review or modify the Grievant's discipline.

*Gateway School District v. Teamsters Local 205*, 181 A.3d 461, 466-67 (Pa. Cmwlth. 2018).

As indicated above, in reviewing the Statement of Charges, the Arbitrator stated the following, in relevant part:

I disagree that any of Grievant's conduct described above clearly conforms to the charges lodged by the [District]. I have not found any willful neglect of duties

---

[14] Pursuant to Section 414(a) of our Internal Operating Procedures, 210 Pa. Code §69.414(a), unreported panel decisions of this Court issued after January 15, 2008, may be cited for their persuasive value.

29

. . . [or] immorality[.] I can agree that the conduct [Teacher] described was annoying, and that there were unnecessary interactions, personal communications and gifts. The District also contends in the charges that Grievant's conduct affected other coworkers (presumably aside from [Teacher]) who directly observed his actions or indirectly became aware of them. The [S]tatement, [of Charges], however, failed to acknowledge that coworkers became aware of the conduct largely because [Teacher] told them about it. The public never knew about it. Moreover, the discomfiture to others was minimal and quickly dissipated.

The Statement of Charges also relies upon a letter dated June 1, 2012, from the Superintendent Charles Erdeljac to Grievant, which related to a matter involving a female colleague. . . . It is an eloquent statement which is relevant here. "Wisdom dictates awareness of and great deference to the boundaries between work and private spheres, and between professional and personal lives. Employees are always well served to avoid situations and venues where those lines can too easily be blurred or obscured." It was, however, not regarded as a written warning or a disciplinary letter, and cannot be used for progressive discipline as it was here, nor can it be characterized as willful defiance of a policy directive. It does, however, provide a basis for an analysis of Grievant's conduct. However, I cannot conclude in the absence of any clear warnings or communications from supervisors or administrators that Grievant's conduct constituted . . . persistent or willful failure to follow District policies and directives or immorality.

R.R. at A271-A272 (footnotes omitted). *See also Slippery Rock University*, 241 A.3d at 1288 ("'[A]n arbitrator must be given latitude and flexibility in fashioning a proper remedy and should not be limited in his or her problem solving to the exact language of the agreement.' The [CBA] sets no limits on the remedial power of the arbitrator. Thus, the arbitrator's award of back pay to [the g]rievant neither adds to, subtracts from, nor modifies the [CBA].").

30

As exhaustively outlined above, the Arbitrator's numerous factual findings are amply supported by the evidence of record and may not be reviewed by this Court on appeal. Those extensive findings support the Arbitrator's modification of the sanction imposed by the District under Section 1122(a) of the School Code. Nevertheless, the District makes the bald assertion that the penalty as modified by the Arbitrator does not satisfy the essence test, but fails to cite any provision in the CBA limiting the Arbitrator's authority to review or to modify the sanction that the District imposed. In the absence of such a provision, the Arbitrator did not err in modifying the penalty that the District imposed. *Gateway School District*.

In sum, the District utterly fails to allege or to demonstrate that the Arbitrator acted beyond the authority conferred by the CBA in modifying the sanction that was imposed, or committed any reversible error in this regard. As a result, the trial court did not err in denying the District's petition to vacate the Arbitrator's award, and in affirming the Arbitrator's award as to the modified penalty that was, in fact, imposed.

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview School District,                  :
                                             :
                        Appellant            :
                                             :
            v.                               : No. 1144 C.D. 2018
                                             :
Riverview Education Association,             :
PSEA/NEA                                     :

# **O R D E R**


AND NOW, this 12th day of July, 2021, the order of the Court of Common Pleas of Allegheny County dated July 16, 2018, is AFFIRMED.


_____
MICHAEL H. WOJCIK, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview School District,       :
         :
         Appellant     :
         :    No. 1144 C.D. 2018
      v.          :
         :    Argued: February 12, 2020
Riverview Education Association,    :
PSEA/NEA               :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE RENEE COHN JUBELIRER, Judge
              HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

## ***OPINION NOT REPORTED***

DISSENTING OPINION
BY JUDGE McCULLOUGH              FILED: July 12, 2021

"It now is well established that there is an explicit, well-defined, and dominant public policy against sexual harassment in the workplace." *Philadelphia Housing Authority v. American Federation of State, County & Municipal Employees, District Council 33, Local 934*, 956 A.2d 477, 483 (Pa. Cmwlth. 2008) (*PHA I*), *aff'd*, 52 A.3d 1117 (Pa. 2012). In my view, the arbitrator and, by extension, the Majority, fail to appreciate the legal significance of this public policy and the fact that the aggressor in this case violated said policy. Accordingly, because the arbitration award explicitly conflicts with the public policy against sexual harassment, I would reverse the order of the Court of Common Pleas of Allegheny

County (trial court), to the extent that it upheld the arbitration award, specifically the punishment that the arbitrator imposed upon the aggressor.[1]

Here, the record reveals that, in June of 2012, Bernard Campbell was admonished by the Superintendent of Riverview School District for inappropriate conduct with a female colleague and was directed by the Superintendent to maintain proper, professional boundaries with female colleagues. Shortly thereafter (and in spite of) the Superintendent's reprimand and warning, Campbell engaged in numerous, unacceptable, and downright disturbing interactions with a different female teacher (Teacher). Indeed, the arbitrator's own findings of fact conclusively establish that Campbell's course of conduct toward Teacher constituted sexual harassment and a hostile work environment as a matter of law. As recounted by the trial court:

> When the following examples of [Campbell's] conduct are viewed in the totality of his interaction with [Teacher], they compel the conclusion that such conduct was "of [a] sexual nature": placing his hand on her knee; kissing her head; expressing his desire for a "romantic relationship"; referring in a letter to the "numerous times he felt like kissing [her] and didn't"; and telling her that "if not for their respective spouses, they would be together."
>
> . . . .
>
> [Teacher] "explained that [Campbell] regularly engaged in non-work-related, personal conversations, and routinely invaded her personal space to the point where she asked

---

[1] In deciding whether to apply the public policy exception, the court must consider (1) the nature of the employee's conduct leading to his or her discipline; (2) whether the employee's conduct implicates a well-defined, dominant public policy; and (3) whether the arbitration award poses an unacceptable risk that it will undermine the implicated policy. *Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education v. Association of Pennsylvania State College & University Faculty*, 71 A.3d 353, 363 (Pa. Cmwlth. 2013). An arbitration award that explicitly conflicts with a well-defined public policy must be vacated. *Id.*

him to step back . . . . [Teacher] noted that several times she received gifts that made her uncomfortable or [Campbell] would place his hand on her knee or kiss her head, to which she implored him to leave her alone." Other invasions of her personal space caused [Teacher] to tell [Campbell] that his conduct was "upsetting and out of line" . . . . [Teacher] "had trouble sleeping and sought counseling from the Center for Victims." **Thus, [Campbell] persisted, over a period of two years, in a course of unwelcome conduct designed ultimately to get a female colleague and one-time friend into bed. The cumulative effect of this obsessive behavior created a "hostile[] or offensive working environment" for [Teacher] and caused her much anxiety**.

(Trial court op. at 3, 4) (emphasis added).

Notwithstanding his findings of fact, the arbitrator concluded that, while certainly inappropriate, Campbell's actions merely amounted to some sort of "misconduct," unprofessional behavior so to speak, and did not rise to the legal level of sexual harassment. In affirming, the Majority determines "that the [a]rbitrator's award does not contravene the public policy against sexual harassment, and that **the public policy exception does not apply in this matter**." *Riverview School District v. Riverview Education Association, PSEA/NEA* (Pa. Cmwlth., No. 1144 C.D. 2018, filed July 12, 2021), slip op. at 26 (emphasis added).

To the contrary, in reviewing the arbitrator's factual findings, the trial court concluded that Campbell engaged in "obvious sexual harassment" and that the arbitrator's legal characterization and minimization of Campbell's conduct "was based on a clearly erroneous understanding of the law." (Trial court op. at 4 & n.5.) I agree with the trial court on these points and would conclude that the arbitrator erred in failing to acknowledge that Campbell's behavior in the form of sexual harassment was so severe and/or pervasive that it constituted a hostile work environment, as a matter of law, and violated public policy. *See*, *e.g.*, *United States*

PAM - 3

*v. Wyoming Military Department* (D. Wyo., Case No. 2:16-CV-055-SWS, filed March 21, 2018) (unreported), 2018 U.S. Dist. LEXIS 144590, at \*26 (concluding that the defendant's numerous "personal emails, frequent and lengthy office visits, declarations . . . that he 'loved' [the plaintiff] and had a 'crush' on her, and the songs and poems he wrote for [the plaintiff] constituted pervasive, intense romantic attention that a reasonable person would find hostile or abusive"); *Brandau v. Kansas*, 968 F. Supp. 1416, 1421 (D. Kan. 1997) (concluding that the plaintiff stated a hostile work environment claim based on sexual harassment where the defendant committed the acts of "telling [the] plaintiff he loved her on multiple occasions, kissing her, and telling her the best thing in his life would be to make love to her"). This fundamental error on the part of the arbitrator, in turn, permeated the arbitrator's award and penalty, namely his decision to reinstate Campbell after a nine-month suspension without pay.

"[T]he inquiry into whether an arbitration award violates a dominant public policy requires an inquiry into the award itself, *i.e.*, the remedy." *Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, 210 A.3d 993, 1011 (Pa. 2019). In other words, "the reasoning and the award [] cannot be separated one from the other." *Philadelphia Housing Authority v. American Federation of State, County & Municipal Employees, District Council 33, Local 934*, 52 A.3d 1117, 1128 (Pa. 2012) (*PHA II*). Our Supreme Court has instructed that "the rational way to approach the question is to recognize the relationship between the award and the conduct[] and to require some reasonable, calibrated, defensible relationship between the conduct violating dominant public policy and the arbitrator's response." *Id.*

"Although a labor arbitrator's decision is entitled to deference by a reviewing court, it is not entitled to a level of devotion that makes a mockery of the dominant public policy against sexual harassment." *Id.* at 1127-28. Here, the arbitrator erred in failing to recognize that his findings of fact established definitively that Campbell engaged in a course of conduct that amounted to sexual harassment as a matter of law. As such, "the arbitrator's reasoning betrays a lack of appreciation for the dominant public policy" against sexual harassment, and the arbitrator's "reasoning [] obviously infected his award." *Id.* Therefore, I would reverse the trial court's order, insofar as it upheld the arbitration award, because Campbell created a hostile work environment and, in so doing, contravened the strong public policy against sexual harassment. Because the arbitration award explicitly conflicts with a well-defined public policy, it cannot stand and must be set aside.

Hence, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge

Judges Cohn Jubelirer and Ceisler join this dissenting opinion.